Our next case on calendar is Eyre v. City of Fairbanks, 23-35206. Each side will have 15 minutes. Good morning. We appreciate you coming to Alaska, saving us the trip to Seattle, so thank you for that. I'd like to reserve three minutes for rebuttal. The district court's decision in this case erred in denying the defendant's motion for summary judgment on qualified immunity for two primary reasons. First, the district court's decision failed to recognize the significance of its finding that at the time that Mr. Eyre was shot, he posed a sudden and immediate threat to the arresting officers, and this was the reason, this is what prompted Mr. Eyre's shooting. Second, in faulting the police officers for keeping Mr. Eyre within their lights and sight so he could not escape into the darkness and potentially harm others. To move to my first point, the district court made a very important finding in this case. The district court correctly found that Mr. Eyre suddenly pointed his firearm at the responding officers while verbally threatening them, and this action is what prompted the officers to respond with deadly force. Now, this circuit has routinely held that the suspect presenting themselves as an immediate threat to the officers is one of the most important factors that needs to be analyzed in an excessive force abuse claim. And once this finding is made, it's not dependent upon whether or not, you present yourself as a threat to people, it's either the officers or the public, and it doesn't depend on whether you have one or both, as long as you have one. The district court in its decision in this case distinguished Blanford v. Sacramento on the basis that in Blanford, the suspect at that time presented himself as a threat to the public, he was going to enter into a home, but not to the officers. In the case law in this case, in the Ninth Circuit, Wilkinson v. Torres, for example, says it's either one. It doesn't matter whether it has to be one or the other or both. And in this case, he presented himself as an immediate threat to the arresting officers at the time that he was shot. Crouse v. – there's a unique thing about the district court's order in this case. In footnote 206, whenever the court is finding that there should have been a warning that was given to Mr. Iyer in this case that was somehow insufficient under the facts of the case, in footnote 206, the court cites contrary authority. Two cases that say whenever somebody is pointing a gun at you under circumstances similar to this, that a warning of drop the firearm is sufficient. Crouse v. County of Mohave is one of those, and Craig v. County of Santa Clara is another. District court's own order acknowledged that the case law in the Ninth Circuit was conflicting under the circumstances present in this case. Specifically, let's talk about Crouse v. County of Mohave first. In that case, the officers arrive at a residence. Mr. Crouse comes to the door and starts to raise a firearm at the officers. They shout, drop the gun, and then he didn't, and they shot Mr. Crouse as immediate threat to them without any warning whatsoever. Can I ask you, the shooting here from the first shot to the last, by my count of the video, spanned something like 18 seconds, I think. And the plaintiff is making, one of the arguments on the other side is that even if the decision to open fire was justified, that at a certain point the decision to continue firing was not. So can you address that? I'd have two responses to that, Your Honor. First is that that was not an argument that was raised and presented to the district court below. Secondly, it's kind of ironic in this case that there's two criticisms that are made of the officers in this case. One is that they're somehow at fault for trying to keep him within their lights and sight, so they can keep him in their eyesight and respond to what he may do. And the other is, then, that they didn't precisely know exactly what he was doing, and whenever they shot over a period of time, because it's 10 below, he's quite a distance away from them, there's smoke and heat and all these things going on that obscure people's visions, and so we're kind of criticizing the officers for the two different things that are directly in conflict. Why isn't that a jury question? I mean, why shouldn't the jury get to figure out whether the officers could see that he was down and maybe didn't have the firearm even in his hand anymore? Because there is no clearly established law that says that under these circumstances they were doing something that was inappropriate. Well, there is clearly established law that says if he's down and doesn't have the firearm, they can't shoot him more, right? Yes. And so isn't that a fact dispute, whether that's the situation at least before the end of the shooting? Let me back up. There's clearly established law that says that if they're down and disabled and no longer presenting themselves as a threat to the arresting officers, you have to stop shooting. What you have in this case is some officers, given the smoke, the cold, the heat, believe that he was on the ground, but still presented himself as a threat and continued to shoot. And if the jury believes that, then it will be true that they have a full defense. But if the jury doesn't believe that because some of the officers said they could see him and he was down and didn't have the gun anymore, then if the jury believes those officers, the jury could rule for the plaintiffs, right? Isn't this a jury question? If you get to that far along in the analysis and you question whether or not these officers had the right to start shooting in the first instance I'm trying to follow up on Judge Miller's question. So let's assume they had the right to start shooting in the first instance. But at some point, I mean, you can hear it on the video. They say he's down and then they say, you know, is he moving? And they're talking about what they're seeing. And some of the officers in their deposition testimony seem to say that before the end of the shooting, he was down and didn't even have the gun anymore. So if the jury believed that testimony, then I don't see how you could win because you already said that if he isn't a threat anymore, you can't shoot him. Your Honor, I'm not aware of anywhere in the record where anybody said he was down. They recognized he was down and didn't have the gun anymore before the shooting stopped. So Officer Jocelyn at 277 to 78 says fell to the ground and he was no longer a threat. And then she talks, I think it's a she, talks about more shooting after that, which means it was in the middle. Yes. So why isn't that testimony that the jury could use to believe that he should not have been shot any further? Because under the facts of this case and under clearly established case law, there is no reason why these officers couldn't have slightly different perceptions because of their inability to see Mr. Ayer, because under the facts of the case, he's quite a bit of distance from them, and there's smoke, there's gas, there's these kind of things going on, and you have a right as a police officer to continue to shoot until you know that the threat has been neutralized. I agree with you that if the jury finds that they couldn't really see and they didn't know that the gun was down, that you would win. But I'm still having trouble understanding why this testimony doesn't create a fact dispute that needs to go to a jury. Because it's not inconsistent for these officers to have different perceptions of Mr. Ayer under these circumstances because they can't see him that well. And so there's nothing inconsistent about that. If I'm an officer and I'm here and I'm shooting at Mr. Ayer because I believe he's presenting himself as an immediate threat to me, I have a right to shoot until I know that that threat has been terminated. So are you saying that her testimony, I think Officer Jocelyn, I don't know the gender, that Officer Jocelyn's testimony does not create a fact dispute about whether they could see and what he was doing? What I'm saying is the testimony of one officer does not create a fact dispute as to the other officers in the circumstances where their vision and their ability to detect Mr. Ayer is different because they're quite a bit away, we have smoke, we have heat, it's 10 below, and so they are not seeing the same things. Usually we have cases that say when the officers have conflicting testimony that creates a fact dispute. You obviously can't ask the decedent what was going on because he's not here anymore. So usually when the officers have different testimony, that makes it a jury question. But you're saying there's something different about this case in particular. I'm saying that in this case the officers were quite some distance from Mr. Ayer, there was things that were obstructing their vision, and there's nothing inconsistent about their observations of Mr. Ayer being different under those circumstances. In fact, you would expect it to be different. If they're different, it doesn't make them inconsistent. What would make them inconsistent is you're both seeing the same thing, you both have the opportunity to detect the same thing, and you report different things. In this case, these folks are spread out, they're there, and what they see from one officer to the other is expected to vary given the conditions that they were operating under at the time. Is that requiring us to take the inferences in the officer's favor, though? Because we are supposed to take the evidence in the most favorable of plaintiffs. So one interpretation would be the other officers really couldn't see. Another interpretation would be those other officers are lying. How do we use the inference that they actually couldn't see? The undisputed evidence is that he was quite some distance away and their vision was obstructed by the cold temperature combined with the discharge of the firearm. In drawing that inference, are you basing that on the video? I mean, is that what you want us to rely on? It's based on the testimony of the officers at the time. And that I have a site that I can tell you in the record where that is, Your Honor. Give me a moment to get there. At 2-13, and the excerpt of the record at 2-13, there's direct testimony about the smoke, the obstruction, their inability to see Mr. Eyre clearly under those circumstances, and so that there may very well be. If one officer sees that their vision is not obstructed, they can clearly see that Mr. Eyre is on the ground, that he's no longer presenting himself as a threat. That does not mean that another officer has that same vision under these circumstances. Can you go back to your very first answer to the question that I asked was to note that this theory that they should have stopped shooting was not presented below. Do you think it's forfeited? Certainly. I think it's waived on appeal whenever you never raised it below. What about the rule that we can affirm on any grounds supported by the record? Do you think that applies here? I mean, we'd be, I guess, affirming in part. Well, we'd be affirming on something that the record was never fully developed on because it was never argued, and the parties never had a chance to even really focus on this evidence. So you'd be making a decision based on an incomplete record, based on an argument that was never presented below, and that the defense was never given an opportunity to address in any way. And how should the plaintiff have presented it below? I mean, maybe procedurally. In their opposition to the motion for summary judgment, they should have said, look, we believe there's a fact question here because there's some conflicting testimony. I don't even agree it's conflicting. I think it's just different points in time where people are talking about different observations that they make and said we believe that raises a fact question, and we could have been able to respond to that in some way. And if you had had that opportunity, are you saying you would have presented more facts? Because I think the record is the record. We have these depositions already. Are you saying that you would have submitted more factual testimony or you would have just made an argument that, like, you could make now? Well, I think it could have been both. I mean, I don't want to go back and it didn't happen, and so it's a hypothetical. Well, I think it matters, though, because if all it is is argument, you could submit a brief tomorrow. Is there something that you think factually you should have been able to do in the district court that you can't do now? Your Honor, I have to go back. You know, I don't know that I can answer the question to kind of go back in time and say what would we have done different if we had been presented with an argument that we weren't. I think we certainly could have more fully developed the record on it, could have submitted more briefing and said, hey, here's the issues, highlighted the differences in the ability of people to perceive what was going on at the time, and argued to district court that there is no inconsistency here. What there is is people having a different opportunity to observe what is taking place. Counsel, I want to follow up on these questions. So I've got the same timeline that Judge Miller referred to. It's about 18, 19 seconds, depending on how you calculate it. As I watched the video, I saw four sort of four separate series of shots. So on the first one, shots are fired in apparently by five officers. The second shots are fired about 10 seconds later. And do we know who those officers were or how many people shot? I don't think the record is perfectly clear on that, no, Your Honor. Then there's a shot fired about four seconds later by one officer. Do we know who that officer was? I'm not sure that the record establishes that either. The last shot fired 18 seconds later appears to be a single shot. Do we know who that officer was? I don't believe the record establishes that either, Your Honor, directly. I want to emphasize and move on to one other issue here before I run totally out of time. There's no—the district court's obligation, this court's obligation, is to evaluate whether there's clearly established law that prohibits what the officers did. In this case, what the district court did is the district court said that, well, the facts of this case are we have an individual who's armed, intoxicated, and suicidal and heading to his ex-girlfriend's house. And yet the district court faults the officers in this case for trying to keep that Mr. Ayer within their sight so he doesn't slip off into the darkness and create a threat to other people. And then cites this duty to warn that we've created this situation that demanded the use of force by our own negligence, our own reckless conduct, and cites three cases that are factually inapplicable in any way, shape, or form to the facts of this case, Nehad v. Browder, Lamb v. City of San Jose— I'm sorry. I think I should interrupt you because we have read what the district court said and you're out of time. If you want a minute for rebuttal, I think probably you should stop and come back after. Thank you. Good morning, Your Honors, and may it please the Court. Colin Reeves for Applee, Kyle Ayer. The officers in this case violated clearly established law when they shot and killed Cody Ayer in two separate flurries of gunfire. The district court properly denied the officers qualified immunity. This court should affirm it can do so in any of three ways. First— Sorry, can I just ask, when you say two, we were counting four, I think, so where do you start the second one? It is—it's—I think it's—yes, we've delineated it into two separate sets of shots. I think it would be shots—sets two through four under Judge Bybee's analysis, and I think it would be correct under this court's case law, the Roque case from the Fifth Circuit that we cite, that it would be appropriate to actually look at it as four sets of shots because there are those breaks. And do you know who fired in what you're calling the second set of shots, or sets two through four? Do we know who those officers were? So we know that all of the officers fired other than Nathaniel Johnson. Right, certainly on the first volley. The first and the second volley. So we don't know—so Nathaniel Johnson tried to shoot both times, and we know he didn't, and the officers also say— they all say that they shot during both volleys. You can very distinctly hear at 1357 in the tape and 1401 in the video. I think this is probably the suite video. Those are a single shot both times. Do we know who that officer was? We don't. My thought is that—and what I think the jury could infer— that at least for one of them and maybe both, it distinctly sounds like a shotgun that's being shot, and Alondrae Johnson was the only officer who had a shotgun. I don't recall if that was the third or the very last, third or the fourth. You didn't explain any of this. By this I mean the idea that we could sort of disaggregate the shooting and break it down into separate volleys and think that the later volleys present distinct legal issues from the initial one. You didn't present any of this to the district court, did you? We did. The appellants are just simply wrong about that. On docket 83 is the heirs' opposition. On page 3 in the facts, we set out distinctly that there were two separate sets of shots, and then on page 11 of the opposition, in the argument section, we argued— a separate paragraph that's explicitly about the second set of shots. It says, there is no evidence that the second round of shots were a reasonable use of force, and then it proceeds to explain for the exact same kind of reasons we're seeing here. We certainly put more meat on the bones. I'm sorry, this is your opposition to the motion for summary judgment? Yes. Page 11? Yes, docket 83. We didn't put it into the appellate record because we weren't anticipating that there would be any kind of waiver argument here, so it's not part of the supplemental excerpts of record or the excerpts of record. Okay, I'm looking at—I have here your opposition to the summary judgment. That's at docket 50 with a later round. Yes, so as a procedural matter, this case, like the other ones that we've been hearing about, was affected by COVID, and so there was sort of a lag in discovery. The officers made an initial summary judgment motion while discovery was pending. We then made a response, and that was docket 50. And we said, okay, we need a continuance. And so there was a separate—the district court agreed with that, entered that. So there was a later summary judgment motion. I think it was around docket 75. It sounds like you've mentioned the second set of shots. Did you cite cases? Did you argue that this was excessive force and show us how this was clearly established law? I mean, I'm just—you know, what did you say about this? We did not cite specific cases about that. I mean, the issue was clearly presented to the district court. The district court just did not have to reach it because district court held on alternative grounds or denied qualified— And are you defending the district court's decision on the grounds on which you decided the case? Yes, yeah, on— Yes. So that would be an alternative way that the court could resolve or affirm for the district court as well. Affirm in favor of there would be on the same kind of theory that the district court— So if you were—let's suppose that we did not think that the district court's decision could be sustained on the grounds on which it was actually decided. And so you'd like to press this alternate theory. What case should the officers have read that would have told them that they clearly could not fire shots under these circumstances? Well, the officers themselves conceded that it was clearly established. This court's decision at Zion clearly established— Which involved a knife. It did, but the court there didn't— I mean, it said that what it was saying was especially true about knives, but it didn't say it wasn't true about firearms. There's a sentence about that. Zion was really a brutal, brutal case where an officer— It certainly was. Way overboard. Egregious, yes. And it really was egregious. And I'm not sure what reading Zion would have told these officers. Well, I think in no uncertain terms, the court held that when someone has been taken to the ground and they're incapacitated, or at least a jury could find that they've been incapacitated, and there the officers argued that he was still moving and that he had access to the knife, that officers would stop and reassess. They would hold their fire unless and until they knew that that person was trying to reengage or posed a threat or was a flee, a flight risk. And what about Esteta Fernandez? There we said that Zion did not establish a clear rule on this. We described Zion as having described the rule as murky, I think, and said that there wasn't a case clearly establishing when you have to stop shooting. Well, that's not how I understand Hernandez. It said that under the facts in Hernandez, the law was not clearly established. And it took three facts in particular that it found to be at issue in Zion as being not at issue, in essence, in Hernandez. Essentially, they were disputed in Hernandez, undisputed in the officer's favor. Excuse me, disputed in Zion, undisputed for the officers in Hernandez. And those three facts were that whether Hernandez was trying to get up, and the video showed that he was trying to stand. The second was whether he had the weapon in his hand, and he unquestionably did. They found him with the weapon in his hand. And then the last one was whether the officers believed that he still had the weapon in his hand. And all three of those things cut in favor of error in this case. Cody was not trying to get up, and there's testimony to that effect, and the video shows it. The video is obviously not that clear. Yeah, so I was going to ask. I take it, under Scott against Harris, we can look at the video, right? Well, sure, but it has to blatantly contradict, right? Okay, but— In order to basically take that as sort of the— But your friend on the other side made the point, which seems to be confirmed by my, at least my view of the video, that once the shooting starts, because of the smoke, or maybe I don't know if it's smoke or condensation from the guns, you can't see very much anymore. Sure, so I think that's true from the angles of the two officers that have the body cams. They're over there on the left, and Tyler Larimer was one of the ones who had a body camera, and he said that he couldn't really see. And so he just made his best guess once he started shooting the second one. Other officers to the right didn't say anything like that. And we can look at their testimonies. They didn't say, we didn't know where he was. They said specifically, they made specific statements about exactly where he was. Christine Joslin says, he's down on the ground. All I saw was a pile of clothes, and then I saw him roll over. She says she saw. Same thing with Alondra Johnson. He says he goes down to the ground and was moving. But he just shoots simply because he's moving. He never sees him with the gun, unlike in Hernandez. And here, of course, he was found. But Joslin has asked, he fell to the ground and was no longer a threat. Then why did you fire again? Because he rolled over, and the gun was pointed at us again, and I felt that he might shoot at us again. I mean, that's pretty straightforward. I thought he might be setting up for a second try. And that's her testimony. But a jury, of course, would not need to credit it. I mean, there are five other officers here who all said diametrically opposed things. We have two officers who said he was still standing. Actually, three officers said he was still standing. Three said he was still down. One of those officers said both things. He said during the events, he said, shots fired, suspect is down. And then later, days later, he says in no uncertain terms, he does not say, oh, I couldn't see. He says he was still standing in the same place. And then later, he moved down. So a jury, of course, could look at that and look at the video evidence and the physical evidence and simply not find those to be credible. I mean, that is what this court has held in other cases like Newmaker, NCV, Longoria, when there's inconsistent police testimony, especially in a fatal shooting case. Let's suppose that I thought that there was just sort of one volley, that I thought it was just really sort of one continuous volley. There were a lot of shots fired here. And that's not unusual in situations like this. If I thought it was just one long set of shots, wouldn't there always be a question of fact if the plaintiffs came in and said, well, they fired 50 shots and they really only needed to fire the first 20? And after that, he was down, and anything after that was excessive force. Wouldn't that make all of these kinds of officer shooting questions turn into questions of fact in which there would never be qualified immunity? No. So two points in response. One is that in Plumhoff, the Supreme Court said they sort of encountered the same argument. They said, well, it wasn't excessive to just shoot a whole bunch of shots. But they did say that it would be or they certainly suggested that it would potentially become excessive if the victim was down on the ground, had given himself up, and a jury could find that here. And also I would point out in Hernandez. But if all the plaintiff has to do is to say he was down on the ground after the first 25 shots, and so the second half of this one volley was unnecessary and therefore excessive, it would turn all of these questions into questions of fact. I don't think that would necessarily follow. And I think we know that in part from Hernandez. In Hernandez, it says one of the important parts is that based on Zion, there was a break there of two seconds. There were three sets of two shots. There was a break of two seconds between one and a break of one second before the last one. And the Hernandez panel said that was sufficient to make it a jury question in that case. Well, we have even a longer set of time. But we also said there was no case that clearly said that. No. Well, no. So that's not what I understand the court has held. So that was enough for a question for this to get to the jury on the constitutional, the underlying constitutional violation. The court held that under the facts of that case, that where Hernandez was still trying to get up, still had the weapon in his hand, and the officers thought he still had the weapon in his hand, that the law, that Zion had not clearly established. But that's not what this case is. This case, we know he didn't have the gun in his hand. The video and other officers, no officers say he's trying to get up. And the officers didn't, other officers, some officers did not even think he had the gun. They didn't see him with the gun once he was down on the ground. So this case is far more like Zion than Hernandez, in which case it would then. But this case is so unlike Zion in so many other ways. Hernandez can't be the clearly established law because it postdates this case. That's true, and we're not lying. But it may be useful on the question of qualified immunity. But if Zion is the best case that you've got, this is so different on its facts from Zion. Again, you have a knife, you have an officer who is kicking a suspect in the head after he's already shot him. Well, the kicking was a separate element of that case. It wouldn't just be Zion, though. I mean, the qualified or the clearly established analysis is not just whether this court or the Supreme Court has issued binding case law, but you look at the general consensus of case law. And we can see that from what the Fifth Circuit has done and what other courts have been doing for decades, is that when someone has been brought to the ground and they're incapacitated, officers must stop and reassess the situation. That's exactly what the officers should have done here. They knew that. I mean, there really is no question that the law was clearly established. And I would just point the court to two parts of the record that show that the officers knew that. On page 231, Trooper Thomas explains why he stopped the first time, and it's exactly the kind of thing that this court was talking about in Zion. He says, I stopped to reassess the situation. Page 300, Larimer says the same thing. I stopped to reassess the situation. The officers knew the rule here, and that's essentially what qualified immunity is all about. And then a jury could find that the facts here support a verdict for the plaintiff. What is the best testimony you think that shows that after the first round, he was incapacitated and no longer a threat? Well, I think 278, the testimony that you cited from Trooper Joslyn. But she does go on to say that then he rolled over and pointed the gun at us again. So you want us to credit part of it but not the other part, or what do we do with that? So I think what we know is that a jury could find that he at some point ceased to be a threat, and then it could credit in saying, well, based on what that testimony is, coupled with the video evidence, coupled with the physical evidence that he's found face down with a bullet wound in the back of his head, that he ceased to be a threat. But that's true. I mean, this is, I think, the point Judge Bivey was making. In every fatal shooting, they fire N shots, and the result is that the person is dead, right? So you could come along and say, well, really it only should have required N-1 shots, and therefore the last one was excessive. So I think that's not what this court's case law or case law has said for decades, is that when there is a break in the shooting, officers need to justify separate sets of shots. And if there is no break, and if they can show that the threat continued, then they do get to keep on shooting. There's no question about that. But so would we be incentivizing officers to not ever break if we agree with you here? It seems like it's a little bit odd to say because they paused. I mean, it seems like they paused. At least some of them are saying Benny was a threat again. I'm just trying to figure out. It sounds like what you're saying is if they just hadn't paused, they would be fine. But that's a weird rule, isn't it? Well, so I don't understand the case law to say that only if, say, there's been a pause, then that they need to justify later sets of shots. The rule has always been that each use of force needs to be justified. And if someone ceases to become – ceases and is no longer an immediate threat, officers need to pause and reconsider. So they – I mean, the rule is already there that they do need to take a pause. And so – As I recall, your theory is that the fatal shot was likely one to the head. Is that correct? Yes. Is that a shotgun shot or is that – was that a rifle or a – That's not in the record. I'm not aware. Okay. Because you told me that you thought that the officer who fired the third and fourth volleys, which were single shots, was probably a shotgun. I'm not sure if it was both of those shots. It sounds – as I hear it, and I'm no expert when it comes to – I'm no expert. I couldn't – I wouldn't have had any idea that that was a shotgun. But it sounds like there's a – like there's a – like a recoil from a shotgun for at least one of those shots. And I'm not sure which of the two. I don't recall. If we thought that the – just hypothetical. I don't know if this is possible. But if we were to decide that the problem here was just those two final shots, what we're calling the third and the fourth, is there evidence that those shots hit him? Or do we have any idea, causation-wise, how much those shots mattered? That's not in the record at this point. I don't know. How many shots do we think were fired total? We – I think it was – inferring based on what they've all said, I think it was in the ballpark of 60 or so. Okay. As one officer shot him. How many shots hit him? It was – I think it was between 10 and 20. And I would just also note that – so two things. I think there would be two ways that the court could issue a pretty limited order here affirming remanding is that one is that – so the second set of shots was put in front of the district court. The district court did not reach it because it did not need to. It's obviously a heavily fact-intensive issue. It would make a lot of sense to send it back to the district court to review that in the first instance rather than this court to do so. And the second is the officers have never responded to the second set of shots, not even in their reply brief here. So arguably, I think it's fair to say that the issue of the clearly established aspect of the second set of shots is not actually properly before the court because the officers have not pressed that point. They've relied pretty much exclusively – they've lumped them together as a single set of shots and then relied on the immediacy of the threat before the first set of shots. And they've never said anything about – that the law was not clearly established on the second set of shots. Counsel conceded that officers need to actually stop and reconsider things once there's been a pause. And that the law is clearly established on that. So I think there's two ways in which the court could affirm sort of on pretty limited grounds. One would be to just send it back to the district court to look at it in the first instance. And two is that the officers have just not presented this issue on the second set of shots to the court. So they've essentially forfeited that issue. Well, it's not too surprising that they wouldn't raise this because it's not the grounds on which the district court decided the case. Sure, but they didn't argue it in their reply brief in the district court, nor did they argue it in the reply brief here. So when we put it in front of them. If there are no further questions. Thank you very much. We're taking you over your time. Let's put two minutes on the clock for rebuttal, please. Thank you. I just want to make sure that I'm kind of filling the gaps on the record. You asked me questions earlier. You cited some of it on this issue about why there was a first, second volley, however many volleys you want to talk about it. It's in the record at .277, which is the one that Your Honor quoted about. He then rolled over and pointed the gun at us, and I probably fired another three thoughts, and that's Officer Christine Jocelyn in the record at .277. Then in the record at .278, it was directly asked about this pause. She was asked, why did you shoot the first time? Because he pointed the gun at us. And then, okay, you said you fired that three to four shots. What made you stop the first time? Her response, he fell to the ground and was no longer a threat. Then the follow-up question is, well, why did you shoot again? And the answer is at .278, because he rolled over and the gun was pointed at us again, and I felt that he might shoot us again. He might shoot us initially. I don't recall him ever shooting. In addition, Officer Thomas testified in the record at .230, he didn't, after the first two rounds, he didn't go down. He was still moving. It looks like he turned. He might have turned a little bit to his right and was still moving. So then I fired again. And then he's asked, why did you fire again? He still had the weapon in his hand, and he was still moving. So I think that is where the record talks about why that occurred in the way that it did. As far as the idea that this was raised below on page 11 of 25 of their brief, what they actually say in there is they say there was no evidence the second round of shots were a reasonable use of force because they should have warned him to stop moving before they shot again. So it was kind of tied to somehow an idea that we should have warned him to stop moving before we shot him in that instance. Lastly, I just want to make sure I point out to the court, the City of Tulloch, Oklahoma v. Bond case. I think it is the most applicable case to this case. It's a United States Supreme Court case. It involves very similar circumstances. It absolutely debunks this, you create the threat issue. In that case, they said not only do you have to have clearly established law on the law, but on similar facts, somewhat similar facts where you could extrapolate that these facts mean you should not be doing what you're doing. And that case said and rebuts the idea that Allen v. Muscogee is somehow precedent for anything related to what happened in this case. Unless the court has any other questions, I'm out of time. Thank you. Thank you very much. Thank you both for your wonderful arguments. This case is submitted. Do you want to take a break? I'm good. I'm good. Okay. We'll call the last case then.
judges: BYBEE, FRIEDLAND, MILLER